I'm Robert Corn Revere for the appellants in this case. And I have to say, this is something of an unusual appeal. And the thing that makes it unusual is how many things the district court got right. It found, for example, that the plaintiffs have standing to raise the claim, that the plaintiffs stated a claim that the ordinance violated their First Amendment rights, that stated a claim that the condom requirement was an unconstitutional prior restraint. It found that the suspension and revocation provisions of Measure B were unconstitutional prior restraint as well, that the definition of adult films in the ordinance was overly broad and vague, and that warrantless searches authorized under Measure B violate the Fourth Amendment. But what the court got wrong is that it incorrectly held that the plaintiffs were not entitled to a preliminary injunction only after extensively rewriting the ordinance. And it did so despite the fact that the record showed that Measure B has adversely affected the production of adult films in Los Angeles County. It's not in the record, but press reports since then have indicated that the number of permits issued for such films has plummeted by up to 95 percent during 2013. So during the time that I'm before you, I'd like to focus on three things. First, that the court should have enjoined Measure B in totality and not just pieces of it. Secondly, that even as rewritten, Measure B still imposes an unconstitutional prior restraint that bests local authorities with unbridled discretion. And third, that it fails under any level of scrutiny because there's no evidence in the record that it would materially advance the government's asserted interests. What is the restriction on speech? Because the measure does not bar the depiction of anything. It only bars the way in which the film is made and not the depiction of anything. But it also requires a license before films can even be made, which is why you get to the prior restraint. And so then you also look at the conditions that are imposed and the way in which they affect the production of adult films. But even that, we only get to this interpretation of Measure B by engaging in a substantial amount of judicial legislation. As I mentioned, the major provisions of Measure B were struck. Right. And the measure says that it's severable and that if anything is removed, the remainder shall remain in effect. Well, the severability provision also says specifically that provisions are severable. It says nothing about individual words being severable, which was important to this court in Acosta v. City of Costa Mesa, saying that you look to the language of the severability provision to see what it really relates to. But allowing what was left of Measure B after this bit of judicial legislation to go into effect was improper. The district court didn't just sever certain provisions, it rewrote them. It modified the definition of adult film, which affected the scope of what was left to go into effect. It, in fact, struck 42 of the 71 words of the definition that were about 59 percent of what goes into defining the scope of Measure B. And didn't what the judge did in this case comport with the recent decision that opposing counsel provided the court just last week? The Wynn case, the State case that you were talking about that was submitted? People v. Wynn. Right. I was a little bit puzzled that that was submitted as supplemental authority because the holding in Wynn was that severability was not permitted. The only finding was that it met one of the three criteria, all of which must be met before severability is permissible. To be severable, something as a matter of law must be volitionally severable, grammatically severable, and functionally severable. In the Wynn case, the court merely held that it was grammatically severable, but denied severability on other grounds. And here, no single one of those criteria are met. Do you think the district judge here did too much wordsmithing, as we say? I believe so. I think he took a blue pencil to the definition of adult film and, as a result, came up with an entirely different measure. And, again, the Acosta case is very instructive here. But the point, I think, of the letter that was submitted in the case is that whatever wordsmithing is done, if you don't change grammatically, the grammatical severability is separate, survives. In other words, here the judge took out the offensive parts and left intact what was appropriate. But what's not permitted is to change the meaning of the statute. For example, if you take a word out of one clause because it relates to something that was severed, then you can make an argument that that is grammatically severable. But where you refashion a definition, you refashion a provision that doesn't necessarily affect the other severed parts, but simply changes what goes into effect, then that is not permissible. And, again, that was the point of the case, this Court's decision in Acosta, where it said we know of no cases where a court is allowed to change the meaning of the sentence by engaging in severability. But it's not just the grammatical issue. It's the other factors of severability also were not met. It's not only... Can you answer this? Can you point to any evidence in the record, other than intervener McGrath's statements in the article submitted, that suggests Measure B was crafted out of concern for the effects pornographic films have on their audience? In the record, is there anything? Yeah. Well, the main evidence we have is the statements by the drafter of Measure B, that we don't need these kind of jobs in California, showing great hostility to the adult industry. And it's the kind of evidence that the Supreme Court has relied on in cases like IMS Health v. Thoreau, where it looks at what the actual concerns were of the people who fashioned the provision. That case was a case involving the use of data for marketing purposes. But, again, I think those kinds of indications can be taken into account. But even if they are not, Measure B is still unconstitutional. It's certainly not functionally severable, where you take out both the enforcement and the funding provisions. There's no example of where that has been permitted. And it's not volitionally severable, either. As we pointed out in our briefs, that AHF, in promoting Measure B, said not just once or twice, but placed in bold the guarantee that taxpayers would not pay a dime for the enforcement of Measure B because we have these funding mechanisms. Well, that was one of the provisions that was struck out. So it's not just a problem of whether it's grammatically severable. But Measure B, as being rewritten this way, doesn't meet any of the tests for severability. So what happens to the funding, assuming this is the final result? It has to come out of general taxpayer revenue? I would assume so, because there's no other funding provision in Measure B. It was specifically crafted as being something that would be self-funded through the medical permitting process. I don't understand enough about how State law operates. If your funding provision is cut off, is there authority to then use general funds, or do you just not do it then? I'm not sure I understand that. I can't answer that question with respect to California law. I think in the federal law, within broad limits, spending is earmarked. You can't spend rent money for services, for example. You can't spend travel money for buying equipment. Those things are earmarked. But we don't know how this operates. Yes, so far as I know, and maybe our friends from AHF can enlighten us, this was specifically crafted as a measure that was meant to be self-funded. And so at this point, it's left with no visible means of support. We don't know. What would be the consequence if there is no funding, if the consequence of having no state funding is it can't go to taxpayer revenue? Well, the consequence would be a ban on adult films, because the law as it is, you have to have the permit, you have to go through the training for transmission of blood-borne pathogens, and then once you do that to the satisfaction of the county, you get a permit. And if you don't go through that process, you're subject to criminal penalties. So if there is no permitting process at all, then it operates as a de facto ban on adult films. But even if you accept that it could be rewritten, it is still, nevertheless, unconstitutional. As I pointed out, producers still have to get a permit before they can begin filming. They still have to, again, go through this training process. And the selection of the approved training courses, which is left intact, is left entirely to the discretion of the county. We don't know what is required. As a result, we think there is still undivided discretion on who gets a permit in the first place, because it has to be an approved training course. And this parallels exactly... I'm sorry? CLE will take care of it. That's right. But I'd like to see who signs up to be professors in that one. The selection of the approved training courses, though, parallels exactly the reasons why Judge Pregerson held that the revocation provisions were vested in the county with unbridled discretion, because it said that a permit could be canceled for violating, as he wrote, unnamed, undescribed standards affecting public health. What do you think would be permitted? The state law has the same basic requirement, and the findings that support Measure B specify, among other things, that there are a lot of instances of violations of the state law. Do you think that the county has any means to assure itself that producers of adult films within the county obey the state law? Well, I assume Your Honor is referring to the CalOcean Regulation 5193. And I would have to say that is an interpretation of the very broad law of fairly recent vintage. The CalOcean Regulation has been in effect since the early 1990s. It's only been in the last couple of years that the interpretation has been claimed that this very broad law can be applied to this area. Now, there may be as-applied challenges to that, and we can talk about that if you want. But the question before the Court now is whether or not you can overlay that pre-existing law with a licensing scheme that does nothing but try and duplicate that measure. Or supplement it with further requirements, because if it duplicated it, you wouldn't be here complaining. Well, it supplements it with a prior restraint, which is one of the reasons why it is still nonetheless unconstitutional. And so the issue is whether or not Measure B, by its own terms, still has constitutional infirmities. And the fact that it does require prior permission and the undefined discretion for getting that permit in the first place explains why it's unconstitutional. And in fact, it's like a regulation if you required someone to go to an accredited high school and post his diploma before he could vote, and then you don't describe what the curriculum is going to be. That prior condition on a constitutional right presents... Why isn't it more like a health and safety regulation that requires a restaurant to be inspected and then post its inspection certificate so that people can know that the food that they're about to eat is healthful? Well, for one thing, speech is treated differently from food. Well, voting is treated differently from films, too. Both protected by the First Amendment, I would submit. And as a matter of fact, there are examples of health and safety regulations that are more relevant to this scenario, where at least the California Supreme Court has held that there are First Amendment limits. In 1988, the California Supreme Court addressed the issue of People v. Freeman, which asked whether or not California's prostitution and pandering laws could be prevented to prevent the production of adult films or to prosecute those who paid people to participate in adult films. The court explained that that law was adopted expressly for a health and safety reason. And nevertheless, the court held that because it was being applied to this industry, that it raised inherent First Amendment problems, and that because of the First Amendment, it could not be applied in that way. Let me give you a different example. Let's suppose that the county said we've had way too many fires and accidents in the making of movies, and we're going to demand that everybody take fire safety classes in order to make these films. Just leave aside the sexual content. Equally infirm, can the county require that, so that people aren't injured by falling objects and fires? I think that, once again, to the extent the county could adopt a measure like that, it would be subject to the same First Amendment constraints, in that it would have to be specific, and it would not lead to the discretion of those who were adopting those measures. Okay, but assuming the carve-outs that the district court made, it is quite specific. And my example is quite specific. So is that okay or not okay, to say you have to have fire safety training and post a certificate stating that you've had fire safety training, et cetera, et cetera? I think, again, if you tried to focus that on a specific genre of movies instead of your movies... You're really squirming out of my example. It was a yes or no question. Any film that depicts or hopes to depict a fire or a car crash has to go through this. Because we're concerned that people will be harmed by fires and car crashes that are not properly done. I think for such a measure to be constitutional, you have to have very specific guidelines and no discretion before a permit could be granted. And that's not the situation that we have here. Moreover, the other constitutional infirmity here is that nothing has shown that the training advances the government's purpose. I'm sorry. Explain. You said this is different from what the situation is here, but how is Judge Graber's example different? I mean, she said, look, if it's a movie that involves a fire, you've got to have fire training, right? No discretion. How is that different from the situation, from this case? Again... Is it discretion? Well, the discretion is what is required to show compliance in order to get the permit in the first place. Even where the government has an undoubted ability constitutionally to regulate, it still is governed by the requirements of both specificity, a prompt grant of the license, the ability to do an immediate appeal, and, again, there are limitations. While it doesn't cancel the government's ability to regulate in the area, it does put constraints on how it imposes those regulations. And that's what's missing here. That's the difference between the hypothetical and what we have with Measure B. I have one question before your time is up already. Interveners contend that your assertion that Measure B can have no possible health effects depends on, in their words, baseless assumptions about how the adult film industry will respond to a continuing kind of mandate. What do you say to that? The problem is, the burden of proof is on the government, and because the interveners have taken on to show that Measure B will have a substantial material effect in ameliorating the concerns that prompted the passage of Measure B. Here, there's no demonstration whatsoever that Measure B will have a positive   effect on promoting health and safety, because people would simply go elsewhere to make their films. AHF itself has said in its brief that, or actually in its opposition to our preliminary injunction motion, that this doesn't restrict anybody's speech because they can simply cross the county line, which is why the Department    I think that's a good point. In their brief to this Court, one of the objections that AHF had to screening, which the adult industry has been doing for years, is saying that, well, people will have sex outside the county, and people will have recreational sex. All of those things are true equally to undercut the reasons why Measure B might have any positive effect at all. And for that reason, since it is the government's burden to show that they are going to have a positive effect, they fail to meet even intermediate scrutiny. Thank you. Tom Freeman on behalf of the intervening appellees. I wanted to first address the issue of severance and go directly to this notion that there's an unfunded mandate here due to the district court's ruling. That, in fact, is not the case. The district court did not rule that funding provided for through this measure is likely to be unconstitutional or in any way inadequate. What the measure says is that the Department of Public Health shall come up with a fee for permits that is geared towards the cost of monitoring, of operating this permitting program.  And we did not have access to the information that the Department had to prove that that fee was basically revenue neutral. And so what the judge said was you cannot charge the fee until you either show it's revenue neutral or come up with a different fee that's revenue neutral. So there's been no determination that there is an unlawful funding mechanism that was passed through Measure A. This is simply a matter of getting the number right and showing that it's revenue neutral. Also, in terms of while we're on severance, I wanted to hit a couple points here that opposing counsel addressed. The Winn case that we submitted really does show what the grammatic separability requirement is all about. It's not sort of a backhanded way to get into a volitional test and say, well, you know, how significant are the changes or whatnot. It is a very technical requirement. And it basically says if you can, you know, basically strike the effect of defending provisions and you still have language that makes grammatical sense, then you've passed the grammatical test. So it's not a substantive test. And there is language in ACOSTA that seems to suggest that it may be more get outside that realm. And to the extent it does and it's been relied on for that purpose, the  Winn case would be controlling and this Court is not bound to follow ACOSTA if it's inconsistent with or to the extent it's inconsistent with a new California Court of Appeal case. In terms of taking a break and taking a drink, aren't you a little uncomfortable in this context? This is not a piece of legislation that a legislative body passes and a judge tinkers with it. There's a lot of technical rewriting here and it's, I'm a voter, I voted on this bill and now this bill is what really is going into effect and striking certain provisions there. Context, makes you a little uncomfortable? It doesn't in this case. It could, if, for example, the judge struck out the requirement that condoms be used, that could be troubling because in this particular case, this statute is the key feature of the statute. And I've been criticized for using marquee feature, but the key feature for this statute and what everybody knows this measure as is the condoms in porn statute, widely known by the voters, widely understood. The fact that Judge Pragerson decided that he needed to strike oral sex from the definition of adult films is not something that I would be comfortable with. It's not something that the voters are likely to have said, wait a second, if I would have known he was going to strike that provision, I wouldn't have voted this. What the voters wanted is they wanted to protect workers. What about the financial impact that we talked about earlier? I as a voter thought, okay, it's not going to cost me anything, let's go for it. But now I find out it's going to cost me. It's not going to cost you. Because Judge Pragerson did not rule that the funding mechanism was in any way improper. It's just a matter of proving up the right amount to pay. And that's simply a matter for the Department of Public Health to, you know, get this right, get this litigation over with so any uncertainty is gone. And they can then turn to the business of enforcing this measure. I have a theoretical question that's prompted by Judge Zuhari's question. And it betrays my ignorance of California law. But in Oregon, a statute that is enacted by the legislature and a statute that's enacted by the people through the initiative process are analyzed exactly the same way for purposes of severability where there's a severability clause and constitutionality and in every other respect. Is that also true in California or is there a different standard for severability for an initiated law? The cases have been treating them, the California cases have been treating them the same. I don't know that there's been a holding saying that. But they haven't. In fact, a number of these cases that we've submitted are direct, you know, examples of direct democracy measures. And they apply the exact same severability test. So I don't believe there is. Now, there's, in terms of, you know, what... This is troubling me. You are defending Measure B in the... I'm sorry. Interveners are defending Measure B in the face of the adult film industry's claims that its STD screening requirements are entirely effective. Yes? Correct. Yes. Therefore, there has to be some sort of evidence that suggests that that's not the case, or else the condom mandate is redundant and does not advance a government interest. Yes? I'm not sure what would make the condom... It would be redundant if the screening was 100% effective. Or entirely effective or whatever phrase you want to put on that, or mostly effective or something.  The 2009 DPH letter notes the screening requirement shortcomings, but again, the key question for me is whether I can rely on that letter, which came afterwards. And here's my concern. Maybe not so much in this case, but setting a precedent for other cases. My concern is opening the door wide for post hoc justification using evidence that was not relied on by the governmental body that drafted the suspect legislation. So let me answer that. Yes, please. Actually, the Department of Public Health letter came out in September of 2009. It predated this measure. And when you look at the measure, when you look at Section 2, the findings and declarations, it refers to that letter, contrary to what opposing counsel states. It doesn't refer to it by name, but it refers to it in this fashion. Under Section 2D, the Los Angeles County Department of Public Health has documented widespread transmission of sexually transmitted infections associated with the activities of the adult film industry within Los Angeles County. It's referring to that letter. So this isn't a case of, you know, we'll pass something and then we'll come up post hoc with a justification for it. There were very serious concerns that were raised by that letter. Now, the county decided what it was going to do. Well, we'd rather have a state. We'd rather have state legislation than putting the burden on us to deal with it. And the voters said, okay, well, we appreciate that, but we're looking at the same evidence, the same risk of this. And what we're saying is that's not good enough. We're not going to wait for the state to step in and come up with something that has teeth on it. We're going to pass this as a popular measure. Which they did. How do I know that that's what they were referring to? Well, they're referring to there is only one documented study of STDs in the adult film industries within the County of Los Angeles. Now, you know, it's also important to look at the Alameda Books case, which talks about the government's burden in these types of cases. Burden shifting framework, yes. Talk about it. Okay. So it is very important. Because what they talk about in Alameda, and they harken back to Renton, is that the government, the local governments and governments in general have a great deal of discretion in determining what's going to work and what's not going to work. And they are not held to a standard of you have to have a particular study, even though we do have a study in this case, you don't have to have a particular study of, you know, how would it work in Los Angeles, would this work in Los Angeles. You do need to have evidence showing that there's a connection here between sex without condoms and the spread of disease within the workplace. And you're saying that connection is the DPH letter? It provides it, as well as later down they talk about multiple organizations and they list organizations which also believe that the use of condoms in the production of adult films is important. And this is the type of information that in the words of the Supreme Court can be reasonably relied upon by the government in coming up with ideas about how to deal. Justice Kennedy even allowed for common sense, as I recall, in his plurality opinion. That's correct. But common sense alone wouldn't do it. I guess it depends on what you mean by common sense. But we don't have to worry about how narrow you get there. Common sense would tell you it will just take it to Ventura or to Orange County or to San Bernardino or Riverside. We're surrounded by counties in Los Angeles. There are counties all over. So why wouldn't common sense tell you that this is ineffective because they'll just take it across county line? Well, of course, other counties can. First of all, what has happened is not in the record. And, you know, other counties can. When lawyers say that, they're about to tell me something that's not in the record. No, I'm not. We believe it's speculative to raise this saying everybody's going to go out of town. That would be true of a statewide law as well. Because if California as a state did something similar to this, you know, everybody might go to Nevada. But that wouldn't make the law per se unconstitutional. It depends a little bit on how large the geographical area is. Right? If Beverly Hills adopted this, it would probably be very highly or Pasadena and no one else would be highly ineffective because going across city lines, probably nobody does any filming in Pasadena. No, I'm kidding. We have trucks here all the time. I've heard about the trucks. Taking rest breaks, apparently. It turns out this street is just always used by Hollywood for some reason. They like the houses. Not for this kind of film. Okay. Nothing you know of. There's no permits. But, you know, it depends on the geographic area. If it is a nationwide ban, going to Canada or Mexico would be more difficult. But going across state lines is easier, but still more difficult. But going across county lines just strikes me as being not very, or across city lines. Or precinct lines. You know, if it's a small enough area, you might say the thing is ineffective just because it's so easy to circumvent. Well, I guess there are a couple of responses. In being a First Amendment case, at least in the media scrutiny, why wouldn't you have to have some level of effectiveness as the minimum? Well, I mean, one, you could really say, you know, we can, you know, almost any law, local law, can be you can go out of town. However, in the opening brief, the plaintiffs... Well, we're dealing with First Amendment. Most of the time that argument doesn't count. So saying you could always say that, you can't always say that because most cases don't involve the First Amendment. So you can exclude the 90 or 95 percent of cases that don't. So now we're in a situation where you can't always say that. But we're in First Amendment land, right? With at least in the media scrutiny, right? That's correct. Okay. So why isn't the fact that this is so easy to circumvent by going not very far from here to the county line? I don't know. I'm just taking guesses. It's about 25 miles. Well, according to the plaintiffs, it is not so simple. According to the opening brief, Los Angeles County has the infrastructure that makes, you know, doing this business so important that they're challenging this regulation because it would be allegedly highly impactful for them to move somewhere else. Also, you know, Los Angeles has passed this now. Ventura could pass it tomorrow. You know, all these different places could pass the same regulations for the same reasons tomorrow to say that, well, Los Angeles can't be the first because everybody else has to do it, because otherwise there's a risk that it will move across county lines. And how many of them will move across county lines? And won't this create an incentive to use condoms? And isn't that legitimate? Let me ask you to get back to Acosta and Wynn. You made the argument, which is sort of passed by, but I do want to get back to it, that somehow Wynn overrules Acosta, but I'm not sure how you see it. Acosta is a Ninth Circuit case. We're bound by Ninth Circuit authority. The only exception to that, or if you call it such as Miller v. GAMI, are you familiar with our in-bank opinion Miller v. GAMI? No. It's brilliant. I will have to check that out. I can only wonder who offered it. Me too. Well, Miller v. GAMI says if Supreme Court authority supersedes our precedent such that it is no longer viable, then the three-judge panel, we need not go in-bank. We can sort of say we're writing on a new slate, and the three-judge panel essentially is no longer overruling circuit authority because intervening Supreme Court authority has vitiated the effect of the earlier ruling. Now, this is not, Wynn is not a Supreme Court opinion. It's not even a California Supreme Court opinion. I'm not at all sure that Miller v. GAMI applies to State court rulings at all. There's a different line of authority in the Ninth Circuit. I believe that one of the first, and it's based on interpretation of U.S. Supreme Court opinions talking about how, you know, the obligation of the Federal Court is to apply State law when State law applies. And I was looking for it here, and I can't seem to lay my hands on it. But I believe it's Owens v. Owens, and I can't remember. It's like a 1982 opinion, and it's been recently cited in this circuit. It basically says if there is a Ninth Circuit opinion interpreting California law, and that interpretation is inconsistent with a newer California Court of Appeal opinion, then the panel deciding the case has an obligation to determine, apply the proper assumption that the California Court of Appeal is correct. I guess I don't even read Acosta to say that you can never sever a single word. I mean, the California Supreme Court in this is. Well, we may not. Acosta may not get us there, but I'd like to assume that Acosta applies. And I do want to get to that next, because that's what's going to be my next question, what happens if Acosta is binding. But so your answer is you think. This panel actually has the obligation to decide the issue with the California decision in mind. Is this a case you've cited in your brief? No, because we didn't know this was an issue until we got the Nguyen decision. What makes this unique. I see. So it's in your 28J letter. I didn't cite it there. Applying the Nguyen decision. I did not cite it there. So this is something you're pulling out of a hat and you don't even. It's a hat with a hole in it because the citation seems to. It seems to. I'm sure I can during the rebuttal. And you haven't by any chance provided this authority to opposing counsel. No. And maybe it would be an appropriate topic for additional briefing. At least another 28J letter. If you have authority, you need to provide it. You need to provide it to opposing counsel. Yes. And you need to do it like in the next 12 hours? I will do that. I will do that. Before sundown? I will sundown, okay. Depends on how long you ask him questions. I have the authority. With electronic filing and the like, it should not be a burden on you. That's correct. I can get that done and I have the authority. But let us now get to the question, assuming we're bound by ACOSTA, which I believe was Judge Graber's question. Assuming you're bound by ACOSTA, it can be distinguished because it's you. What it says is you can't sever by excising individual words. I think that's what it says. You can think of clauses and stuff, but you can't just blue pencil the statute. So I initially, I previously had interpreted ACOSTA narrowly. What does narrowly mean in this context? It means it doesn't hurt us. But, you know, what they say in ACOSTA is they're dealing with a situation in which the issue is dealt with in the disjunctive, and so I think it was like you cannot, if you're speaking at a public meeting, you can't be disruptive, disorderly, or Disrespectful. Something like, it was, yes, it was unconstitutionally vague. And so I think what the panel really was saying in that case is you can't just, when you offer something in the disjunctive like that, you can't just strike one of them, one of the words, because it is not at all clear that that is what the, was intended in that case to only deal with situations in which somebody was actually disruptive of the meeting. That's about all I can say about that. So it really wasn't about grammar as much as it was about meaning. That was, that's my interpretation of the case. Because there's a California Supreme Court case from 1975 that says severability is perfectly acceptable for even single words, where they can, I mean, it specifically says that. And I apologize that we didn't find that particular case, but there are other cases as well. That may be of interest, but ACOSTA is 2013, which is a more recent vintage. So presumably it took into account whatever authority there was. And what they say is, unlike, this is a page, do we have ACOSTA in front of you, perhaps? I will get it. It's 718 at 820. They say, we say, unlike a clause or phrase, the grouping of individual words does not form a complete grammatical unit, expressing one legislative thought, where we, to excise single words or groups of individual words, we would be rewriting the ordinance in order to save it. So I think that that really, that language really does need to be interpreted to the extent you need to interpret it, looking at what was going on in ACOSTA. Why not just apply it by its own word? You know, why interpret? What is there to interpret? They say you can't, you know, you can't, you can take clauses out, but not individual words or groups of words. Well, ACOSTA is an opinion interpreting California law, and it's interpreting a doctrine of California law. So I don't think we, I don't think it's appropriate to take the individual words used in the opinion and just apply them without. Do we excise individual words in our opinion? Excise some words. Is that what we do? It needs to be read in light of the full context. And here I do think, in ACOSTA, I think that they were correct in the particular case, not, but their gloss on grammatically severable is inconsistent with California law. And we don't have a situation. Maybe we need to go and bank, huh? I'm sorry? Maybe we need to go and bank. Oh, go and bank? No, well, I mean, that's, I will provide you authority that says you do not need to go and bank. One final question for you. Did the district court expressly determine whether the surviving permit requirement is a prior restraint? And if not, I don't believe it did, did it need to do so? The surviving permit as rewritten. I'm sorry, that it was a prior restraint? I think the, with respect, if I may, I think the question is whether the district court decided that the statute that remains after the severances was constitutional under the First Amendment, or did it punt that question? Well, I think he did find it, you know, likely that it was constitutional, and that after, you know, evidence is provided, it will likely be found to be constitutional. Because we're only at the likely stage, because we're at the preliminary injunction stage. That's correct, yes. That's something it needed to do, yes. It does need to, yes. Okay, well, you're way over your time. Thank you. Thank you. I think you went to negative numbers, but since we gave opposing counsel extra time, would you like to take a couple of minutes for rebuttal? You don't need to, but if you would like to, you may have it. Unless the court has any additional questions. I want to make sure you agree with what I just heard from opposing counsel with respect to the 2009 letter, that that was taken into account. The 2009 letter, I think the chief takeaway from the 2009 letter, even though opposing counsel says that that means that the people disagreed and thought that a countywide measure was fine, the reason that the 2009 letter, according to the DPH, opposed the local measures that they said it would be innocent, difficult to enforce, ineffective, because people No, I was more concerned with the timing of it. He's telling me that it was part of the purpose, part of the reason it was prepassage, not postpassage. Is that true? It was prepassage. That is true. Because the measure is 2012, correct? That's right. If you have no other questions. Thank you. Okay. Thank you. Cautious, arduous, handsome minute. And we are adjourned.
judges: Zouhary, Kozinski, Graber